UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE: RAYONIER INC. SECURITIES LITIGATION

Case No. 3:14-cv-1395-J-32JBT

**CLASS ACTION**

**DEFENDANT LYNN WILSON'S MOTION TO DISMISS
AMENDED COMPLAINT AND REQUEST FOR ORAL ARGUMENT**

Defendant Lynn Wilson moves to dismiss the Amended Consolidated Class Action Complaint[1] (the "Amended Complaint") (Doc. 84) with prejudice as to Wilson under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

**I.   Introduction**

The allegations in the Amended Complaint aimed at Lynn Wilson concern two statements she made early in the Class Period, both in 2011, and just months after she joined Rayonier in August 2010. As shown below, the allegations are not actionable and the Amended Complaint is due to be dismissed as to Wilson because: (1) Wilson's statements were accurate and not misleading; (2) Plaintiffs have not alleged any facts that provide a "strong" or "cogent" inference that Wilson intended to defraud the public; and (3) Wilson's statements were forward-looking estimates protected by the PSLRA's safe harbor provisions.

---

[1] Although denominated "Amended Complaint," this is in fact the third complaint in this case (Docs. 1, 64, 84).

II.     **Memorandum in Support of Motion**[2]

    A.     **The Amended Complaint fails to demonstrate that Wilson made an inaccurate or misleading statement.**

Under Rule 10b-5, it is unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). For Wilson to be liable, therefore, Plaintiffs must show that she made material misstatements of fact. *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011).

Apparently in response either to the Order dismissing the first consolidated class action complaint (Doc. 80), or the comments by the Court during the hearing on the motions to dismiss (e.g.,"[W]hen you actually look at what each individual is alleged to have said in your complaint, Wilson and the others, it's hard to find an actual false statement . . . . And without an actual false statement by somebody you can't have a securities law claim, even if it looks like something is amiss." (Doc. 81, Aug. 25, 2015 Tr. at 92)), Plaintiffs' Amended Complaint expands the class period by a year, but still only alleges two instances where they claim Wilson made a misstatement: (1) a three-sentence, off-the-cuff answer Wilson gave to an analyst at the end of a quarterly earnings call on April 26, 2011; and (2) a statement she made during Rayonier's Investor Day conference held on September 22, 2011.[3] In an effort

---

[2]    Wilson adopts in full and incorporates by reference the arguments made by co-defendant Rayonier in its Motion to Dismiss the Amended Consolidated Class Action Complaint and Incorporated Memorandum of Law (Doc. 85).

[3]    The only other comment attributed to Wilson is an undated, vague comment to a confidential witness: "This is what you are going to do, and if you don't, I'll find someone else." Amended Complaint ¶ 105. Plaintiffs do not specify when the statement was made or even what Wilson was asking the confidential witness to do. Such vague and unparticularized allegations cannot form the basis of a section 10(b) claim. *See Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1219-20 (M.D. Fla. 2014) ("[C]onfidential witness

to paint these statements as false, Plaintiffs have deliberately removed the original context of the conversations. When the statements are read in context, however, it becomes evident that Wilson's statements were entirely accurate.

### 1. April 26, 2011 Earnings Call

The telephone conference hosted by Rayonier to discuss its first quarter results for 2011 ended with questions from analysts. During a somewhat rambling monologue, one analyst asked a series of questions about Rayonier's projections for harvest levels in the "middle of the decade," and asked if a "ramp up" over current levels was possible. Wilson responded by indicating that Rayonier was operating at 75% of its maximum output in the Pacific Northwest and indicated that in the future, Rayonier had the ability to "move up to a higher level."[4]

Allegations contained in the Amended Complaint prove that Wilson's prediction was entirely accurate. During 2010, Rayonier had harvested 164 MMBF in the Pacific Northwest. Amended Complaint ¶ 112, Figure 1. In 2011, 2012, and 2013, Rayonier did in fact "ramp

---

allegations, to be accorded much weight, must flesh out at least some of the details of the conversations . . . they describe.").

[4] The full exchange was as follows:

[ANALYST]: One quick follow-up. On the harvest level, I know that, I believe from your recent presentation online, that you are holding back some of your harvest out West even with the strong export demands. But how do you view the current harvest level that we are seeing, say, in 2011 versus what it potentially could be in 20 -- say the middle part of the decade? Are you -- could we see a ramp up? I mean, one of your competitors has it going way up over 10 years; another one has going up for 10 years before it goes down again. How do you view sort of your sustainable harvest potential over the next 5 to 15 years?

LYNN WILSON: We are currently at the 75% level of where we can ramp up to. That's a good point. We do have that ability, as we invest in roads and with our current land-based and harvest profile, that over our next ten-year planning period we can move up to a higher level.

Apr. 26, 2011 Earnings Call Tr. at 13-14 (attached as Ex. 11 to Rayonier's Motion to Dismiss (Doc. 85)).

up" its harvest in the Pacific Northwest just as Wilson predicted it could. During those years, Rayonier experienced harvest increases of 15%, 37%, and 40% over 2010 levels. *See* Amended Complaint ¶ 112, Figure 1.

Plaintiffs do not dispute the accuracy of Wilson's prediction; instead, they are transfixed by the *analyst's* use of the phrase "sustainable harvest potential" and isolate that phrase from the rest of the question to argue that Wilson's response was somehow a statement about Rayonier's potential sustainable (in perpetuity) yield rate.[5] But Wilson's answer included no reference to any sustainable yield rate, nor did she make any representation about Rayonier's ability to maintain the maximum harvest level. And she certainly did not equate Rayonier's maximum harvest level to any sustainable yield rate. Wilson simply said that Rayonier was harvesting at 75% of its maximum level and, compared to its current production, Rayonier had the flexibility to move up to a "higher level" in the future; she gave no assurances that Rayonier's maximum harvest level was sustainable over any certain period of time.

Recognizing the vagueness of the question and answer, Plaintiffs attempt to enhance the significance of Wilson's response by implying that it somehow inspired Morningstar to "publish[] an analyst report highlighting the Company's 'sustainable harvest[ing]' as a reason to buy the stock." Amended Complaint ¶ 51 (second alteration in original). This allegation mischaracterizes the substance of the analyst's report. The Morningstar report does

---

[5] Ironically, the analyst's question directly contradicts Plaintiffs' theory that the entire timber industry employs sustainable yield in perpetuity harvesting practices. The analyst indicates that other timber companies' harvest levels increase and decrease over time based on market demand and other factors: "[O]ne of [Rayonier's] competitors has it going way up over 10 years; another one has [it] going up for 10 years before it goes down again." Apr. 26, 2011 Earnings Call Tr. at 13-14. Such fluctuations are antithetical to Plaintiffs' narrow view of "sustainable" harvesting.

4

not offer a recommendation about whether an investor should buy Rayonier's stock. More importantly, the report's only mention of "sustainable harvest" is when Morningstar was describing the calculation *it* performed to derive Rayonier's enterprise value, and Morningstar indicated that it used *its own* calculation of Rayonier's sustainable harvest level.[6]

### 2. September 22, 2011 Investor Day Presentation

The only other statement made by Wilson that is at issue here is one she made during Rayonier's Investor Day conference held on September 22, 2011. At this event, which was organized for management to discuss its future plans and projections, Wilson presented a high-level overview of the company's timberland holdings and its projections for the future and, specifically, how EBITDA might be impacted. During the presentation, Wilson made the incontestable statement that in 2008 and 2009, Rayonier harvested less than it otherwise could have as a result of the "weakened" market conditions. The reduction is confirmed by the Amended Complaint, which shows a significant decline in harvest levels, 28% and 29% for 2009 and 2010, respectively, compared to 2008 levels. Amended Complaint ¶ 112. Wilson also said that because Rayonier had reduced harvest levels in those two years, it had the ability to harvest more than it otherwise would have been able to in the coming years. The entire portion of Wilson's presentation that is at issue is the following:

---

[6] The only discussion of sustainable harvest in the Morningstar report is as follows:

Our estimate of Rayonier's enterprise value includes three components (1) 'core' timberland value ($2.1 billion) as estimated by calculating the perpetuity value of the cash flows associated with what *we consider* to be a sustainable harvest; (2) HBU timber value ($900 million), estimated for each state as a function of current population density and future population growth; and (3) the value of Rayonier's manufacturing businesses ($1.8 billion). We then subtract 'double counted' HBU acreage and net debt to arrive at our equity valuation.

May 2, 2011 Morningstar Report at 3 (emphasis added).

> [W]e have deferred volume over the past few years in the Pacific Northwest and now we are able to respond over the next five years and really capture that export opportunity . . . .
>
> . . . .
>
> One of the things that we have done over time, if you look at the chart between 2008, 2009, one of the things that Rayonier did was disperse sawlog volumes because of the weakened and soft domestic market. So we have the ability right now with our standing inventory to move up to that 1.8 million ton to 2 million ton volume over the next five years.
>
> So this year, we will be at 1.5 million tons; next year, we're moving up to 1.8 million tons. But we have the ability during this planned period on an annual basis to harvest between 1.8 million and 2 million tons. This increased harvest adds – if you move up to 1.9 million tons as an additional adjusted EBITDA of $18 million a year annually at 2011 pricing. One of the things I'd just like to stress is that what's going on in the Pacific Northwest is independent of what's going on in our other log markets and is a very unique position for us to have.

Sept. 22, 2011 Investor Day Conf. Tr. at 3, 4;[7] Amended Complaint ¶ 156.

Not only can it not be disputed that Rayonier reduced its harvest schedule in 2009 and 2010, but it also cannot be disputed that Rayonier achieved the harvest projections that Wilson shared. Because of the improving economy and China's growth, Rayonier projected that its 2011 harvest in the Pacific Northwest would increase to about 1.5 million tons. Consistent with that forecast, Rayonier harvested 1.512 million tons that year. Nov. 10, 2014 Presentation at 21[8] (showing a harvest of 189 MMBF, or 1.512 million tons in 2011 (based on conversion ratio of 8 tons per MBF)). Likewise, she predicted that Rayonier would "have the *ability* during this planned period on an annual basis to harvest between 1.8 million and 2 million tons." Sept. 22, 2011 Investor Day Conf. Tr. at 4 (emphasis added). And, in fact,

---

[7] The full transcript is Exhibit E to Rayonier's Motion to Dismiss (Doc. 71-7) and is also available online at http://seekingalpha.com/article/295366-rayoniers-analyst-day-conference-call-transcript.

[8] The presentation is Exhibit BB to Rayonier's Motion to Dismiss (Doc. 71-31).

Rayonier harvested 1.792 million tons in 2012 and 1.840 million tons in 2013. Nov. 10, 2014 Presentation at 21. Thus, Wilson's forecasts proved accurate.

Rather than confront the accuracy of Wilson's statements, Plaintiffs reimagine what Wilson said, ignoring her discussion of the economy as one of the factors leading to the harvest reduction and ignoring her discussion of the competitive advantage Rayonier possesses because its Pacific Northwest timberlands are in close proximity to ports that service the growing Chinese market. Unable to take issue with the true context of her statements, Plaintiffs wrongly contend that her statements were made in connection with discussions about Rayonier's "sustainability."  For instance, Plaintiffs allege that during her Investor Day presentation:

- "Wilson highlighted Rayonier's purportedly conservative harvesting practices . . . explaining that the Company continued to harvest below the *sustainable* rate . . . ." Amended Complaint ¶ 54 (emphasis added).

- "Wilson *repeatedly emphasized* the company's *sustainable* harvesting in the Pacific Northwest . . . ." Amended Complaint ¶ 54 (emphasis added).

- "Wilson *stressed* that Rayonier's *sustainable* practices resulted in 'additional volumes [] coming from the Pacific Northwest' . . . ." Amended Complaint ¶ 55 (emphasis added).

None of these statements is remotely accurate. Wilson never highlighted, emphasized, stressed, or even *discussed* sustainable yield during her presentation. "Sustainability"—whether in the context of harvest rates or in the context of environmental practices—was simply not a topic of discussion during the Investor Day presentation. In fact, the word "sustainable" was never spoken during her presentation or during any of the other presentations that day. Plaintiffs' placement of Wilson's comments within the context of a discussion about sustainability blatantly misstates what she actually said.

Lastly, it is notable that the Amended Complaint fails to provide "the reason or reasons why the statement is misleading" as required by the PSLRA. 15 U.S.C. § 78u-4(b)(1)(B). In the first consolidated class action complaint, Plaintiffs suggested that Wilson's Investor Day comments were false and misleading because Wilson said that Rayonier "was harvesting at levels that were only 80% of sustainable yield levels, [while] the Company was, in fact, harvesting at a rate over 18% above its sustainable rate." (Doc. 64, ¶ 125.) In her original motion to dismiss, Wilson pointed out that her 80% comment was about product mix—not harvest levels—and that Plaintiffs had completely misconstrued what she said. (Doc. 69 at 10-12.) Conceding their prior error, Plaintiffs have removed from the Investor Presentation Wilson's 80% comment about product mix, but continue to allege her statement was "false and misleading" based on the now deleted quote. Amended Complaint ¶ 157.

In sum, when read in context (rather than Plaintiffs' mischaracterization of her statements), it is evident that Wilson's comments were not false, but later proved to be entirely accurate. In addition, because the Amended Complaint fails to provide the necessary "reason or reasons why [either of Wilson's two comments were] misleading," as required by the PSLRA, the Court should dismiss the Amended Complaint as to Wilson.

### B.  Plaintiffs have failed to allege facts demonstrating a strong inference of scienter.

Plaintiffs in Rule 10b-5 actions must "state with *particularity* facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)) (emphasis added). Although factual allegations may be aggregated to infer scienter, scienter must be found with respect to *each defendant* and with respect to *each alleged violation* of

the statute." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004) (emphasis added).

The scienter inquiry should focus on Wilson's knowledge at the time she made the allegedly false statements and, particularly, whether she knew her statements were false or misleading at that time. That is the framework that the Eleventh Circuit used in *FindWhat Investor Group v. FindWhat.com,* 658 F.3d 1282 (11th Cir. 2011). There, one of the statements at issue was made in the company's March 5, 2004 Form 10-K filing. The court considered all of the scienter allegations in the complaint and concluded that the "Complaint contain[ed] no allegations from which [the court could] infer that anyone . . . knew or 'must have' known about the click fraud before June 2004"—three months *after* the allegedly false statement was made. *Id.* at 1302. Because there were "no facts, much less *any* that are pled with particularity, demonstrating that the Defendants had such knowledge" at the time the statement was made, *id.*, the court concluded it was "impossible to draw the requisite 'strong inference' of scienter" and affirmed the dismissal as to that statement. *Id.* at 1303.

Similarly here, the Amended Complaint lacks particularized allegations about Wilson's knowledge at the time she made the allegedly false statements. The Long Range Planning (LRP) process is alleged to be the source of much of Wilson's knowledge about Rayonier's harvest levels. *See* Amended Complaint ¶¶ 72-84. Yet there are no allegations describing her role in the *2010* LRP process—the LRP process completed immediately before she made her first statement. In fact, given the timing of her hiring, the only inference to be drawn from Plaintiffs' allegations is that Wilson could not have been actively involved in the preparation of the 2010 LRP.

9

The Amended Complaint describes the LRP process as an intensive, year-long project that concluded in November with the operational meetings taking place from June to August. *See* Amended Complaint ¶ 74 (alleging data was "collected for the LRP throughout the year"); ¶ 74 n.13 (alleging CW5 attended LRP meetings from June through August); ¶ 79 (alleging "LRP revisions occurred between June and October, with everything finalized by November")). Yet Wilson did not join Rayonier until August 2010, the very tail end of the process. Amended Complaint ¶ 27. This explains the absence of any particularized allegations suggesting that at the time she made her statements, Wilson knew them to be inaccurate.[9] Even ignoring the unreliability of CW5, Plaintiffs rely only on *generalized* allegations insufficient to demonstrate a strong inference of scienter. For example, Plaintiffs allege "Wilson w*ould have wanted to know* [Rayonier's sustainable rate] in her early days." Amended Complaint ¶ 82 (emphasis added). Equally unpersuasive, Plaintiffs allege facts that are incomplete and shed no light on her state of mind. For instance, they allege that "Wilson was . . . made immediately aware of the level of harvesting in the Pacific Northwest when she began her tenure at Rayonier in August 2010." Amended Complaint ¶ 77. Wilson may

---

[9]    The Amended Complaint contains the general allegation that "the true sustainable rate of 160 MMBF was a 'very important driver for the business', so Wilson would have wanted to know what the number was in her early days at Rayonier" and other allegations attributed to CW5 about the "true sustainable rate of 160." Amended Complaint ¶ 82.  In his Declaration attached to Rayonier's motion to dismiss, CW5 has denied making these and other statements attributed to him.

> I never stated that "the true sustainable rate of 160 MMBF was a 'very important driver for the business,'" that Ms. Wilson would have known or managed and made decisions based on that number. I do not recall Ms. Wilson ever receiving information showing that Rayonier's Pacific Northwest timberlands had a "true sustainable rate of 160 MMBF." I did inform counsel that Ms. Wilson would have known what the harvest projections were and that this was a very important driver for the business. I did not state that Ms. Wilson was provided data showing "harvesting was projected to fall off a cliff."

Declaration of Larry Davis ¶ 19 (attached as Ex. 1 to Rayonier's Motion to Dismiss (Doc. 85)). Accordingly, as set forth in Rayonier's motion, the Court should disregard the allegations in the Amended Complaint attributed to CW5.

have been "aware of the level of harvesting" soon after she joined Rayonier, but that does not reveal whether she was aware of Rayonier's *future* harvest level projections or any age gaps in Rayonier's timber portfolio. Moreover, there are no particularized allegations suggesting that Wilson was aware that at the time she made her statements that Rayonier touted "sustainable harvesting" in the sense alleged by Plaintiffs. *Cf.* Amended Complaint ¶ 152 (identifying October 13, 2011—a month *after* Wilson's last statement—as the earliest date Plaintiffs could confirm Rayonier's website contained representations about its timberlands being managed "in ways that are sustainable and responsible"). In sum, the allegations fall well short of providing any indication of Wilson's knowledge level or state of mind at the time she made the allegedly false statements.

Even more unavailing is Plaintiffs' efforts to link Wilson's state of mind in April and September of 2011 to her performance-based compensation in 2012 and 2013 or the spin-off bonus authorized in 2014. Amended Complaint ¶¶ 190, 191. These events that took place years after Wilson's last statement cannot supply any insight into Wilson's state of mind in 2011 and are therefore irrelevant to the scienter analysis.

On the other hand, if, as Plaintiffs suggest, Wilson had unseemly intentions and believed that a "death spiral" was imminent at any time during the Class Period, Amended Complaint ¶ 5, one would expect she would have sold a significant amount of her stock, but Plaintiffs do not allege that she sold a single share.[10] The absence of this allegation weighs

---

[10] While employed at Rayonier, Wilson was required to file an SEC Form 4 each time she acquired or sold stock (those records can be accessed at Rayonier's website under the Investor Relations tab). During the Class Period (and her entire tenure at Rayonier) Wilson *acquired* Rayonier stock; in fact, she sold Rayonier stock only in order to pay exercise price or tax liabilities. Her history of acquiring rather than selling Rayonier stock is further evidence of Wilson's strong belief in the company's future and dispels any inference of scienter.

against an inference of scienter. *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) *(*"[L]ack of sales by . . . high-level insiders during the Class Period, while not determinative, certainly weighs against an inference of scienter.").

Likewise, the fact that Wilson remained with Rayonier after the spin-off and through the conclusion of the "internal review," Amended Complaint ¶ 8, cuts against Plaintiffs' theory that she artificially inflated the stock price and "then exited the timber business before the truth was disclosed." Amended Complaint ¶ 190. In addition, there is no allegation suggesting that Wilson did anything but fully cooperate with the internal review conducted at the direction of Rayonier's new CEO. Moreover, while Plaintiffs repeatedly refer to Wilson's departure in an attempt to infer wrongdoing, the Plaintiffs neglect to mention that not only did Rayonier's new CEO applaud Wilson for her contributions to Rayonier, but the announcement also indicated that Wilson had agreed to stay on at Rayonier "to provide transition assistance for the next two months." Press Release, Rayonier Inc., Rayonier Appoints Douglas Long as Vice-President of U.S. Operations (Nov. 10, 2014), http://phx.corporate-ir.net/phoenix.zhtml?c=91500&p=irol-newsArticle&ID=1987658. These factors weigh decidedly in favor of an inference that Wilson did not possess the requisite deceitful intent, and on these facts the Court "cannot conclude the inference of nefarious wrongdoing is 'at least as compelling as any opposing inference of non-fraudulent intent,'" and, therefore, the Amended Complaint should be dismissed as to Wilson. *Thompson v. RelationServe Media, Inc*., 610 F.3d 628, 635 (11th Cir. 2010).

C. **Wilson's statements were forward-looking and accompanied by proper cautionary language and therefore immunized by the safe harbor provision.**

A defendant cannot be liable for a forward-looking statement that is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). Here, all of Wilson's statements were forward-looking and, therefore, protected by the safe harbor. During the April 26, 2011 earnings call, the question answered by Wilson focused on Rayonier's harvest levels "over the next 5 to 15 years." Apr. 26, 2011 Earnings Call Tr. at 14. Accordingly, her response was in the form of a *projection* that Rayonier could move up to a higher level of production *in the future*. Wilson's projection was accompanied by meaningful cautionary statements which provided that the "forward-looking statements are not guarantees of future performance." Apr. 26, 2011 Presentation at 2.[11] And among the specific risk factors that Rayonier identified was Rayonier's "ability to identify, finance and complete timberland acquisitions," *id*., which is significant because Rayonier consistently disclosed that potential land acquisitions were factored into its projections of future harvest levels. *See, e.g.,* Sept. 22, 2011 Presentation at 25.[12]

Likewise, Wilson's Investor Day presentation, and the entire conference, focused on management's projections for the future. Rayonier's then-CEO, Lee M. Thomas, announced the objective:

> [T]he focus today is really our plans *for the future*. I think a lot of you are familiar with our performance over the past number of years. We want to talk to you about our performance *over the next few years* and our projections and

---

[11] Attached as Exhibit 10 to Rayonier's Motion to Dismiss (Doc. 85).

[12] Attached as Exhibit D to Rayonier's Motion to Dismiss (Doc. 71-6).

what it means in terms of cash flows, particularly our EBITDA goals for the next five years.

Sept. 22, 2011 Investor Day Conf. Tr. at 1 (emphasis added). Consistent with the conference's objective, Wilson's presentation focused on the future planned period (*i.e.*, the upcoming five-year period covered by Rayonier's LRP):

- "[W]e have deferred volume over the past few years in the Pacific Northwest and now we are able to respond *over the next five years* and really capture that export opportunity."

- "So we have the ability right now with our standing inventory to move up to that 1.8 million ton to 2 million ton volume *over the next five years*."

Sept. 22, 2011 Investor Day Conf. Tr. at 3, 4 (emphasis added).

In addition, the cautionary statements Rayonier made during both its Investor Day and earnings call reference the warnings provided in Rayonier's Form 10-K and clearly highlight the risks of Rayonier's business strategy. For example, Rayonier cautioned investors that it **"may be unsuccessful in carrying out our land acquisition strategy"** and "the failure of any acquisitions to perform to our expectations, could adversely affect our operating results." 2010 Form 10-K at 10; 2011 Form 10-K at 10; 2012 Form 10-K at 10.

### D. The Amended Complaint fails to allege facts necessary to show that Wilson was a control person under section 20(a).

To state a claim under section 20(a) of the Exchange Act, a plaintiff must plead (i) an underlying violation of the securities laws; (ii) that the individual defendants "had the power to control the general affairs" of the company; and (iii) that the individual defendants "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396-97 (11th Cir. 1996) (internal quotation marks omitted) (quoted authority omitted).

Plaintiffs' claim against Wilson for control-person liability fails for at least two reasons. First, as explained above, Plaintiffs have failed to plead facts showing a primary violation of section 10(b). Without a primary violation, Plaintiffs cannot state a claim against Wilson for control-person liability. *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d at 1338 ("Because Plaintiffs have failed to adequately plead section 10(b) violation, the section 20(a) controlling person claims necessarily fail and will be dismissed.").

Second, Wilson never had the requisite authority to "control the general affairs" of Rayonier. *Brown,* 84 F.3d at 396. Even though Wilson certainly influenced Rayonier's harvesting decisions, she never had final decision-making authority. Plaintiffs concede as much when they allege that "Wilson [was] being 'told what the number should be.'" Amended Complaint ¶ 96. In fact, Rayonier's harvest levels were determined in connection with the long-range planning and budgeting processes. And while, according to the allegation of the Amended Complaint, CW5 said Wilson attended these meetings, approval of "the LRP in its final form" was made by her superiors. Amended Complaint ¶ 79. These specific allegations show that Wilson did not have ultimate authority over harvest levels and fatally contradict Plaintiffs' conclusory allegation that Wilson was in a position of control.

### III. Conclusion

The Amended Complaint should be dismissed as to Wilson with prejudice.

### IV. Request for Oral Argument

Pursuant to Local Rule 3.01(j), United States District Court, Middle District of Florida, Defendant Lynn Wilson requests oral argument on her motion and estimates two (2) hours is sufficient time to hear from all parties.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By: <u>   s/John A. DeVault, III                         </u>
    John A. DeVault, III
    Florida Bar No. 103979
    jad@bedellfirm.com
    Michael E. Lockamy
    Florida Bar No. 69626
    mel@bedellfirm.com
    The Bedell Building
    101 East Adams Street
    Jacksonville, Florida 32202
    Telephone:  (904) 353-0211
    Facsimile:  (904) 353-9307

Counsel for Defendant Lynn Wilson

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 26th day of October, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

    s/John A. DeVault, III
John A. DeVault, III
Florida Bar No. 103979
jad@bedellfirm.com
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307

Counsel for Defendant Lynn Wilson