# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| IN RE RAYONIER INC. SECURITIES LITIGATION | Civil Action No. 3:14-cv-1395-32JBT |

## DECLARATION OF LARRY DAVIS

I, Larry Davis, declare as follows under penalty of perjury:

1. I am over the age of eighteen (18) years, and I suffer from no disability or impairment that affects my ability to provide testimony in this case. I have personal knowledge of the facts set forth in this Declaration.

2. I began working for Rayonier Inc. ("Rayonier" or "the Company") in 2001 as Business and Support Services Manager. From 2001 until 2010, except for a period of time in 2002 and 2003, I held various positions with Rayonier, including Director, Real Estate Marketing and Sales and Director, Southeast Forest Resources (later known as Eastern Forest Resources). From 2010 until March 30, 2012, I held the position of Director, Business Development and reported directly to Lynn Wilson, a named Defendant in this matter. I also reported to Paul Boynton during 2010.

3. Since March 2015, I have had approximately five conversations with individuals who represented to me that they were counsel for the Lead Plaintiff in this matter. Those individuals have included an investigator named Amy Bitkower, an attorney whom I believe to be Brandon Marsh, and another attorney named "Jonathan." The last of these conversations took place with Ms. Bitkower and "Jonathan" on September 4, 2015.

4. I have reviewed the Consolidated Class Action Complaint (the "Complaint") and the Amended Consolidated Class Action Complaint (the "Amended Complaint") and have

concluded that I am the confidential witness named in the initial Complaint and Amended Complaint as Confidential Witness 5 ("CW5").

5. I neither made nor agree with some of the statements attributed to me as CW5 in the Amended Complaint.

6. Paragraph 4 of the Amended Complaint states, "As explained by Confidential Witness 5 ("CW5"), a Director of Business Development between 2010 and 2012 with extensive experience in the LRP process, each year the LRP document contained a chart showing Rayonier's executives that the true sustainable rate in the Pacific Northwest was 160 million board feet ("MMBF") of timber annually, and that the Company was harvesting above that rate. CW5 recalled that the Long Range Plan document created each year included a chart that showed the true sustainable rate and showed that Rayonier was harvesting well above it."

7. I neither made the statements attributed to me as CW5 in Paragraph 4, nor do I agree with these statements. I never stated to Lead Plaintiffs' counsel or investigators that each year the Long Range Plan ("LRP") document contained a chart showing a "true sustainable rate" of 160 MMBF. I do not recall ever seeing during my tenure at Rayonier any document purporting to show any "true sustainable rate" for Rayonier's timberlands in the Pacific Northwest. Further, I neither stated that the LRP document contained a chart showing that the Company was harvesting above a "true sustainable rate" for the Pacific Northwest in any year I held a position with Rayonier nor do I recall ever seeing a document showing the Company harvested above a "true sustainable rate" in the Pacific Northwest. I did state that on one occasion around 2006, I saw a five-year harvest projection that reflected a decline in the Northwest harvest levels to a range of between 160 to 180 MMBF, to begin approximately in 2008.

8.  Paragraph 35 of the Amended Complaint states, "The rate at which a timber REIT harvests its trees is particularly important to investors because depletion of timber affects dividends. To maintain 'sustainability,' harvesting must be performed at a rate that is no faster than the rate at which the land replaces the harvested trees. This rate is known as the 'sustainable rate,' 'sustainable yield rate,' or 'sustained yield rate' of harvesting, which produced timber volumes at 'sustainable harvest levels.' As explained by CW5 . . . , the term 'sustainable' harvesting in the industry means harvesting at sustainable yield levels, as well as taking further actions to preserve the land."

9.  I neither made the statement attributed to me as CW5 in Paragraph 35, nor do I agree with this statement. I specifically stated to Lead Plaintiffs' counsel multiple times, including our conversation on September 4, 2015, that to my knowledge, there is no standard definition in the timber industry of the terms "sustainable" or "sustainable harvesting." Further, I told counsel that the absence of a standard definition for sustainability contributes to loose accountability for sustainable harvesting across the forest industry. I also told counsel that my use of the terms "sustainability" and "sustainable harvest" was with my personal interpretation of those terms, which others may or may not agree with.

10. Paragraph 41 of the Amended Complaint states, "At Rayonier, the Company's Long Range Plan, which was updated annually and approved by the Individual Defendants, contained detailed information about its timber inventory and harvest rates, including the true sustainable harvesting rate in the Pacific Northwest of 160 MMBF per year. *See* ¶¶72-84."

11. To the extent that Paragraph 41 attributes this statement to me as CW5 by citing paragraphs 72-84, I neither made this statement, nor do I agree with this statement for the reasons set forth in Paragraph 7 of this Declaration. To my knowledge, Rayonier did not use the

term "true sustainable harvesting rate," and I did not state that the Company's Long Range Plan had a "true sustainable harvesting rate in the Pacific Northwest of 160 MMBF per year." As noted above, on one occasion around 2006, I saw a five-year harvest projection that showed a decline in the Northwest harvest levels to a range of between 160 to 180 MMBF, to begin approximately in 2008.

12. Paragraph 81 of the Amended Complaint states: "CW5 stated that every year the LRP document showed Rayonier's executives the true sustainable harvesting rate of 160 MMBF in the Pacific Northwest. Every year, CW5 explained, the LRP contained a chart that showed that the true sustainable rate in the Pacific Northwest was 160 MMBF per year, and that Rayonier was harvesting above that rate. CW5 stated that in the 2007-to-2009 timeframe, the chart showed Rayonier's Pacific Northwest harvest dropping off a 'cliff,' indicating that harvests needed to be reduced to maintain a sustainable harvest rate. CW5 stated that the Company knew for years that it was harvesting at an unsustainable level while reducing the rotation age, i.e., the length of time Pacific Northwest trees were allowed to grow before being cut down."

13. I neither made any of the statements attributed to me as CW5 in this paragraph, nor do I agree with these statements. Specifically, I never stated that every year the LRP showed, in a chart or in any other form, a "true sustainable harvesting rate of 160 MMBF." Again, I told counsel that on one occasion around 2006, I saw a five-year harvest projection that showed a decline in the Northwest harvest levels to a range of between 160 to 180 MMBF, to begin approximately in 2008. I do not recall ever seeing during my tenure at Rayonier any document purporting to show any "true sustainable rate" for Rayonier's timberlands in the Pacific Northwest.

14. Further, I never stated that a chart existed that showed Rayonier's Pacific Northwest harvest "dropping off a cliff." I told Lead Plaintiffs' counsel and investigators that I recalled reviewing a chart in 2006 or 2007 showing a projected decline in harvest levels in Rayonier's Pacific Northwest timberlands over approximately the following two years.

15. Finally, I did not state, nor do I agree, that "the Company knew for years that it was harvesting at an unsustainable level while reducing the rotation age." I did state, however, that reducing rotation age can be an appropriate action that affects harvest volume.

16. Paragraph 82 of the Amended Complaint states: "CW5 stated that between 2007 and 2009, Boynton participated in meetings with CW5, Vanden Noort, CEO Lee Thomas, and Vice President of Forest Resources Tim Brannon, in which the cliff chart showing Rayonier's true sustainable rate of 160 MMBF was shown. CW5 was also in meetings between 2007 and 2009 in which Eric Fanelli and Aaron Perry presented the true sustainable rate of 160 MMBF to Thomas, Brannon, and Vanden Noort. CW5 stated that, as part of the LRP process, the operations team provided Wilson with data showing what would happen to harvesting over the next five to ten years, and showing that harvesting was projected to fall off a cliff. CW5 further explained that the true sustainable rate of 160 MMBF was a 'very important driver for the business,' so Wilson would have wanted to know what the number was in her early days at Rayonier, and would manage and make decisions based on that number. In addition, by 2009 or 2010, CW5 saw information indicating that Rayonier would have to reduce significantly its harvesting levels in the Pacific Northwest within the next couple of years, with necessary reductions of about 25% to 30% at the time. CW5 further stated that he participated in approximately three meetings per year that were attended by Boynton, Wilson, and Vanden Noort, in which all three executives discussed harvest volumes and price projections."

17. I neither made many of the statements attributed to me as CW5 in this paragraph, nor do I agree with many of these statements. Specifically, I never stated that I attended any meeting involving Messrs. Boynton, Vanden Noort, Thomas, or Brannon in which a chart or any other document showed a "true sustainable rate of 160 MMBF" for the Pacific Northwest. As noted above, I did state that on one occasion, around 2006, I saw a five-year harvest projection that showed a decline in the Northwest harvest levels to a range of between 160 to 180 MMBF, to begin approximately in 2008. To the best of my knowledge, Boynton was not present at that meeting.

18. I also did not state that I attended any meeting at which Messrs. Fanelli or Perry presented a "true sustainable rate" for the Pacific Northwest. Rayonier did not use the term "true sustainable rate." The only meeting that I recall is the meeting around 2006 described in the preceding paragraph and elsewhere in this declaration.

19. I never stated that "the true sustainable rate of 160 MMBF was a 'very important driver for the business,'" that Ms. Wilson would have known or managed and made decisions based on that number. I do not recall Ms. Wilson ever receiving information showing that Rayonier's Pacific Northwest timberlands had a "true sustainable rate of 160 MMBF." I did inform counsel that Ms. Wilson would have known what the harvest projections were and that this was a very important driver for the business. I did not state that Ms. Wilson was provided data showing "harvesting was projected to fall off a cliff."

20. While, as noted above, I told Lead Plaintiffs' counsel and investigators that I recalled observing a chart in a meeting around 2006 showing a projected decline in harvest levels in Rayonier's Pacific Northwest timberlands over approximately the following two years, I never stated that I saw, nor do I recall seeing, any later information showing or indicating a projected

reduction in harvest levels in the Pacific Northwest after those years. Further, while I stated that I recalled Messrs. Vanden Noort, Thomas, and Brannon attending this meeting around 2006, I neither stated nor agree that Mr. Boynton attended this meeting.

21. Paragraph 82, footnote 17 of the Amended Complaint states, "CW5 explained that Rayonier's technical group, led by Aaron Perry, determined the sustainable rate of 160 MMBF prior to Wilson's arrival at Rayonier in 2010."

22. I neither made the statement attributed to me as CW5 in Paragraph 82, footnote 17 of the Amended Complaint, nor do I agree with this statement. I did say that Rayonier's technical group, led by Aaron Perry, was responsible for determining the optimum harvest level. Further, I stated that harvest projections were analyzed and reviewed at least annually and adjustments were made to harvest levels to reflect land sales and acquisitions, as well as other factors.

23. I was not provided a copy of the Amended Complaint before it was filed. Had Lead Plaintiffs' counsel provided me a copy of the Amended Complaint prior to filing, I would have raised the foregoing issues with them at that point.

24. I declare under penalty of perjury that the foregoing is true and correct. Executed on this 16th day of October, 2015.

_____
LARRY DAVIS